ADJUDGED IN

# THE PREROGATIVE COURT

OF

## THE STATE OF NEW JERSEY.

FEBRUARY TERM, 1896.

---

ALEXANDER T. McGILL, ORDINARY.

---

## WALTER L. HETFIELD

*v.*

## EMILE DEBAUD et al.

1. Where it becomes evident to an executor, who holds moneys for the payment of legacies, that considerable delay will ensue before the legacies will be paid, it will be his duty to submit the question whether the moneys held by him shall be invested, to the orphans court, otherwise he will be accountable for interest thereon. And where he mingles such moneys with his own funds or employs them in his business, he will be chargeable with interest upon them.

2. Where an executor fails to keep accounts, and, consequently, there exist obscurity and doubt as to the propriety of a credit claimed by him, the obscurity and doubt will be resolved against his claim.

On appeal from a decree of the Union county orphans court, upon an accounting of Walter L. Hetfield, as executor of the will of Antoine Debaud, deceased.

*Mr. James J. Bergen,* for the appellant.

*Mr. Robert E. Chetwood* and *Mr. George Putnam Smith,* for the respondents.

THE ORDINARY.

Antoine Debaud died on the 14th of October, 1888, leaving a will of which the appellant, the accountant below, became the sole executor, upon its admission to probate in July, 1889, after litigation in which its validity was contested. During the litigation the accountant was the administrator *pendente lite* of the testator's estate, and, as such, became fully cognizant of the character and extent of that estate.

The will required the payment of the testator's debts and funeral expenses, and the erection of a suitable marble headstone at his grave; that his personal estate, except household furniture in the homestead, should be converted into money; that the executor should take charge of and rent all the real estate and keep the buildings thereon insured and repaired; that within two years he should sell the real estate, except the homestead, which he was empowered to sell after the death of Marie Magdalen Klenck, the mother of the testator's widow; that from the moneys realized there should be paid a legacy of $10,000 to the testator's widow in lieu of dower; that the widow should have the homestead and its furniture during the life of Mrs. Klenck, to make a home for Mrs. Klenck during her natural life, upon condition, however, that neither Mrs. Klenck nor her husband should make any claim against the testator's estate; that Mrs. Klenck should also have the use of $2,000 during her life, upon the same condition, the executor to invest the money and pay the interest thereof to her; that the following legacies should be paid: To John Thys, $1,000; to the testator's niece, Emily M. Fernandez, $2,000; to Emma A. Fernandez, daughter of the

last legatee, $1,000; to Ellen M. Saybold, a niece of the testator's, $2,000; to Ellen Lena Saybold, daughter of the last legatee, $1,000; to the children of the testator's deceased brother, Pierre Debaud, $2,000; to the children of the testator's deceased brother, Jeannot Debaud, $2,000; to the children of the testator's deceased brother, John Debaud, $2,000; to the testator's sister, Marianne Ribert, $2,000, and, if she be dead, to her children; that the last four legacies should be paid within one year after the testator's death; that the residuary estate should be distributed in four parts—one part to the children of Pierre Debaud, one part to the children of Jeannot Debaud, one part to the children of John Debaud, and the remaining share to Marianne Ribert, or, if she be dead, to her children.

The testator's sister and her children, and the children of the testator's deceased brothers all resided in France and yet reside there.   The other legatees reside in this state.

Although the estate falling to his care consisted of various properties made up of improved and unimproved real estate, bonds and mortgages, and bank stock, which yielded rents, dividends and interest, the appellant not only failed to keep accounts as executor, but mixed the funds received, with his own funds, relying upon memory, such memoranda as he made from time to time in his check-books and pocket-diaries, and the vouchers he took for payments made, for the information necessary to an accounting.

When his account, after a lapse of some four years, was filed, its items were largely without date and the whole instrument was confused by errors.

A large number of exceptions were filed to the account, many of which were sustained by the orphans court, either upon the accountant's admissions of his error or upon the court's determination upon evidence produced.

The accountant appeals from the decree of the orphans court, specifying, under the second rule of this court, a number of particular objections to it.

The proof shows that the executor received in cash about $27,740, out of which he disbursed some $20,075, paying all

the American legatees in full and making other payments, some of which were disallowed by the orphans court. All those receipts were had and disbursements were made prior to January 1st, 1891. The balance chargeable to the executor was about $7,665, from which he took $2,000 for investment for Mrs. Klenck, leaving in his hands, mingled with his own moneys, some $5,665 which he did not apply to the payment of the French legacies before he was required to account. During the accounting, under compulsion of the orphans court, he paid, on account of the French legacies, $3,000.

The orphans court charged the executor with interest on $4,700 of the unapplied balance in his hands, between the dates January 1st, 1891, and May 1st, 1894.

Of this charge he complains. On the other hand, the respondents insist that the charge should have been interest on $5,600 for the period mentioned.

I do not understand how the orphans court reckoned the sum of $4,700, unless it deducted the highest lawful commissions to the executor and the counsel fee which it allowed to his counsel upon the accounting, from the balance appearing to be in his hands, as though those allowances were vested rights of the executor prior to his accounting, in disregard of the well-settled rule that they become rights only in virtue of their allowance by the court.

It is not, however, necessary for me to ascertain how that amount was reached. It is enough now, that I am satisfied that the executor had at least $5,600 of the funds of the estate in his use for the time specified, and that the contention of the respondents that he should pay interest for that period on $5,600 instead of upon $4,700, if he should pay interest at all, is abundantly supported.

The inquiry then arises whether he should pay interest at all.

He kept two personal bank accounts in which he mingled his own and the estate funds. He has not produced any memoranda, such as are usually made in check-books, to distinguish the sources of his deposits or which determine the balances to his credit, and how much of those balances at different times be-

Hetfield *v.* Debaud.

longed to the estate of which he was executor. I am unable, from his vague and uncertain data and testimony, to reach a satisfactory conclusion as to the manner in which he kept the moneys of the estate. That the moneys were not all in bank is made clear by his tardy obedience to the order of the orphans court, which required him to pay $3,000 to the French legatees, which occasioned the making of an order upon him to show cause why he should not be held in contempt of court, under the spur of which he deposited in bank two sums—$984.50 on June 1st, and $500 on June 2d—to increase his bank balance to $3,066.36 from which he paid the $3,000. According to his testimony these sums were not taken from one bank to augment the deposit in the other, but were taken in cash from his safe. Why they were taken in two sums instead of in one, and on different days, is unexplained. He denies that he used moneys of the estate for his own purposes, beyond the amount he expected to receive for commissions, but he fails to point out with any particularity how much he did use. He utterly fails to show any more money in his possession on the 2d of June, 1894, than the bank balance of $3,066.36 made up on that day and the day before by the addition of the two sums aggregating $1,484.50. His position is that he kept the money always in readiness to meet the demand for payment by the French legatees, and by reference to the fact that minors among those legatees had sought to obtain payment upon guardianship papers rejected by him upon the advice of his counsel, he reasons that his apprehension of a demand upon him at any time was well founded. He contends that, while waiting demand, he could not have done otherwise with the moneys than he did.

The testimony of the executor is attended throughout by obscurity and indefiniteness, and that, with the circumstance of his tardy obedience to the order of the orphans court, is so much at variance with his claims that it is difficult to accord to his testimony implicit credence. It is, however, clear that if he did not make use of the funds of the estate, he, at least, suffered them to remain idle when it was plainly to the interest of his *cestuis que trustent* to have them invested. Those *cestuis que*

*trustent* were foreigners, evidently unacquainted with the forms and requirements of our laws. They were numerous. One, at least, was an infant. It was difficult, because of their language and the distance at which they lived, for them to intelligently and effectively communicate with the executor. These obstacles,.and the executor's evident intention not to himself seek out and pay the foreign legatees, plainly pointed to delay and admonished him that there existed at least a question whether the funds should not be invested until payment of the legacies should be safely accomplished.

The statute (*Rev. p. 777 § 115 &c.*) afforded him adequate protection in making investment, under the direction of the orphans court. More than that, it imposed the duty upon him to apply to the orphans court for direction in that behalf, under penalty of his being charged with interest in case of his neglect to do so.

But added to his duty under the statute, I think he was within the rule of equity which charges an administrator, executor or trustee who negligently suffers trust moneys in his hands to lie idle, or mingles them with his own funds, or employs them in his business, with interest upon them. *King v. Berry's Executors, 2 Gr. Ch. 261; Frey v. Administrators of Frey, 2 C. E. Gr. 71; Frost v. Denman, 14 Stew. Eq. 47.*

I, therefore, am of opinion that the executor should be charged interest as claimed by the respondents.

In the next place, the orphans court held that there should have been an abatement of some $900 from the American legacies, to afford a fund for the payment of the French legatees in equal proportion with the American legatees, and therefore it charges the executor with about that sum as an overpayment by him.

I think that the orphans court was mistaken in this conclusion. By giving legacies and disposing of the residuary estate, real and personal, in a blended mass, the testator charged his entire estate, real and personal, with the payment of all legacies, and hence all the realty which remains undisposed of is liable to their payment, including the remainder of the homestead after

the life estate of the widow. *Turner* v. *Gibbs, 3 Dick. Ch. Rep. 526.* The proofs do not make it appear that there is not sufficient value in the realty remaining unsold to fully satisfy the French legatees. It is remembered that those legatees take the residuary estate, and it follows that they are not injured by the prompt payment of the American legacies and the consequent stoppage of interest upon them, the continuance of which would tend to exhaust the residuary estate. It is within the power of the French legatees to enforce payment of their legacies now by resort to the realty.

The appellant next objects to the disallowance of several items of expenditures for taxes and repairs, touching the homestead property during its possession by the life tenant. I think that the orphans court properly disallowed those items. The rule is that a life tenant must pay the current yearly taxes and keep the property in repair. The proofs do not show that the taxes or repairs were of special character which should charge them or any part of them to the remainder. It is true that, in the second paragraph of his will, the testator provides that his executors shall take charge of "*all*" his real estate and keep it in repair and insured, but this direction is coupled with one which requires them to lease the real estate and collect the rents arising therefrom, and I cannot escape the conclusion that the testator intended to apply his direction for repairs and insurance to that property only which, for the time being, should be in the immediate charge of the executors subject to their lease, and not to exempt the tenure of the homestead by his widow from the ordinary obligations which are incident to her life estate.

In the next place, the executor complains of a charge of $50 on account of the sale of a parcel of property to one O'Keefe. He thinks that O'Keefe paid him $100 in cash at the time of the sale, and he remembers that subsequently Mr. W. R. Coddington, acting as the attorney of a building and loan association from which O'Keefe borrowed $1,000, and as well for O'Keefe, gave him a check for $850, and his check-book and a return check telling that he gave Mr. Coddington his check for $25. He argues that, as the addition of $850 and $100 is $950, and

the deduction of $25 from that sum will leave it $925, the
money he must have received was $925, notwithstanding the
fact that, by his deed to O'Keefe, he acknowledges the receipt
of $975 as the purchase price of the land sold. It is shown
that the bonus given by O'Keefe for the $1,000 loan from the
building and loan association was $150, and that the associa-
tion secured payment of that bonus by giving O'Keefe only
$850, by the check which went to the executor. The executor
then had to look to O'Keefe for the $125 necessary to make the
consideration mentioned in the deed, and his check to Mr. Cod-
dington would seem to imply that the $150 bonus was paid to
him instead of $100 as he now thinks, and that he gave Mr.
Coddington, as the attorney for O'Keefe, $25 when the $850
check was delivered to him, and thus made his receipt for the
property $975, the amount mentioned in the deed. Mr. Cod-
dington has but a vague recollection of the transaction, and his
testimony fails to make clear the situation. It appears that
O'Keefe bought under written conditions of sale which were,
and probably now are, in the possession of the executor, but
that document is not produced. As the proofs stand, I would
not be warranted in disturbing the determination of the orphans
court. I think that the recital of the receipt of the $975 in
the deed given to O'Keefe makes evidence against the executor
which he must overcome by clear and convincing proof. It is
obvious that if the executor had kept accounts this question
would never have arisen. He must bear the penalty of the
obscurity and doubt which now exist. *Blauvelt* v. *Ackerman,
8 C. E. Gr. 502.*

It is a matter of surprise, in view of the fact that the execu-
tor kept no accounts and mingled the funds of the estate with
his own, and that much of the present litigation, which has
mulcted the estate in loss and expense, is due to his conduct in
this respect, that in apparent disregard of the rule to the con-
trary, he has been allowed commissions at the highest statutory
rate. *Dufford* v. *Smith, 1 Dick. Ch. Rep. 216.* I will not,
however, deal with the question of commissions, for no objection
to their allowance has been made. *Rule 2.*

The decree of the orphans court will be reversed, that a new decree may be made in conformity with the views expressed in this opinion.