of active operations as a bank, but there still remained, we think, a hope and prospect of saving something for the stockholders from the wreck. The president of the Metropolitan Bank was to be employed to assist in the conversion of the assets, and he, in fact, gave his time and services to the extent of his ability. The record title to parcels of real estate remained for a time at least in the Metropolitan Bank, subject to provisions of the liquidation agreement that the Metropolitan Bank would make valid transfers of the same necessary to comply with the statute regarding the recording of instruments of conveyance. These formal conveyances were afterwards made by the Metropolitan Bank. The board of directors of the Metropolitan Bank met from time to time, and passed resolutions touching the liquidation of the affairs of the bank, and took official action.

These facts and circumstances differentiate this case from those on which the defendants rely, and we would not be justified in holding as matter of fact or of law that by virtue of the execution of the dissolution agreement the defendants ceased to be stockholders of the bank, and thereby this action was not instituted within two years from the time they ceased to exist as such.

There still remain many interesting questions of law raised in the briefs and upon the argument of this case which might be discussed in this opinion. Especially is this true in reference to the liabilty of certain defendants where defenses have been interposed peculiar to the individual defendant, and not to all alike. We omit any discussion of such matters for the reason that, if the court is correct in the views already expressed on the main questions, there is no occasion for entering into a consideration of the remaining ones.

The plaintiff's complaint, is therefore dismissed, and judgment directed in favor of the defendants, with a separate bill of costs to such defendants as have appeared and separately answered.

---

(G9 Misc. Rep. 646.)

PEOPLE ex rel. BROOKLYN HEIGHTS R. CO. v. STATE BOARD OF TAX COM'RS.

(Supreme Court, Special Term, Albany County.   December, 1910.)

1. TAXATION (§ 376*)—SPECIAL FRANCHISES—ASSESSMENT—VALUATION—NET EARNINGS RULE.

In valuing special franchises of a railroad company in a tax district by the net earnings rule, an apportionment thereof among different lines operated upon the basis of car mileage is permissible where the company's lines are operated with others by a holding company with a single set of general officers, power houses and repair shops.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 376.*]

2. TAXATION (§ 376*)—SPECIAL FRANCHISES—ASSESSMENT—GROSS EARNINGS.

Where proof of actual gross earnings is given in such a case, they must be used as a basis for valuation and not an estimate based upon the gross earnings of the entire system apportioned upon the basis of car mileage, nor should such estimate be taken for depreciation, obsolescence,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

power, repairs, and other expenses of operation, where actual amounts are capable of ascertainment.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 376.*]

3. TAXATION (§ 376*)—SPECIAL FRANCHISES—ASSESSMENT—VALUE OF STRUC-
TURES—COST OF ENGINEERING.
   In estimating the value of structures, the cost of engineering should be included.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 376.*]

4. TAXATION (§ 376*)—SPECIAL FRANCHISES—ASSESSMENT—VALUATION—AL-
LOWANCES FOR FUTURE OBSOLESCENCE OR INADEQUACY.
   Where capable of reasonable ascertainment, allowance for future ob-
solescence or inadequacy as distinguished from depreciation from ordi-
nary wear may be made in valuing a railroad's special franchises for
taxation.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 376.*]

5. TAXATION (§ 376*)—ASSESSMENT—VALUATION—SPECIAL FRANCHISES.
   A railroad franchise may have sufficient value to prevent the tangible
property of the railroad from depreciating to junk value and yet not
have a value upon which a franchise tax can be assessed.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 376.*]

Certiorari by the People, on the relation of the Brooklyn Heights Railroad Company, against the State Board of Tax Commissioners to review a special franchise assessment. Judgment rendered.

George D. Yeomans (John L. Wells, of counsel), for relator.

Edward R. O'Malley, Atty. Gen. (C. R. McSparren, Deputy Atty. Gen., of counsel), for State Board of Tax Commissioners.

Archibald R. Watson, Corp. Counsel (Curtis A. Peters, Asst. Corp. Counsel), for the city of New York.

LA BOEUF, J. Relator is a New York corporation. During 1904 and 1905 it operated as lessee six separate surface electric railroad lines owned by the Brooklyn City Railroad Company, three of which were operated exclusively in the borough of Queens, and three operated partly in Queens, and partly in Brooklyn borough. The percentage of track of the three lines not wholly operated in Queens was $56^9/_{10}$ track miles in Queens, and $43^1/_{10}$ track miles in Brooklyn. As to the last three lines, cars starting from some point in Brooklyn ran to the end of the line in Queens and returned. The relator in addition owned and operated many other railroads in Brooklyn; and, although an independent corporation, its stock was controlled by a holding company known as the Brooklyn Rapid Transit Company. That company was not an operating company, but owned or controlled the stock of various other corporations; and all of these corporations so controlled were known as the Brooklyn Rapid Transit system. The State Board of Tax Commissioners assessed the Brooklyn franchises of the relator, which included the Brooklyn section of the three leased lines in question and many other lines, at $12,460,000. They assessed the relator's franchises in Queens, consisting exclusively of these six lines,

at $1,520,000. The relator sued out a writ of certiorari to review these assessments. The proceedings on the assessment as to Brooklyn borough were by order discontinued. Those brought to review the Queens assessment were continued and, upon the return to the writ, Hon. Martin Saxe was appointed referee to take testimony and report his findings as provided in the state tax law. The referee in his findings has increased the full value of these franchises, as found by the State Board, to $1,707,303.01. He has then equalized the assessment with the assessment upon other real property in Queens, and for that reason only has reduced the assessment from $1,520,000 to $1,365,842. No dispute existed upon the hearing as to the value of the tangible property employed by relator in connection with these special franchises during the year 1904. This value was, therefore, fixed as of the date of the assessment at $418,172.51. The sole question in dispute before the referee was the value of the intangible property which relator claimed had no value, for the purpose of a special franchise tax. On this theory relator's assessment should not exceed $334,538.01 after equalization. This proceeding is brought on before me upon a motion to vacate the report of the referee, and to fix and determine the relator's assessment at a sum not to exceed the conceded value of the relator's tangible property after agreed deductions for equalization. The findings and report of the referee are, under the circumstances, purely advisory and not binding upon this court. It appears that the relator has sustained the burden imposed upon it of showing that the assessment, as made by the State Board, is erroneous and excessive.

The parties to this proceeding and the referee have assumed that the net earnings rule should apply. No proof was given nor suggestion made that this is the case of a corporation enjoying a special franchise which, by reason of mismanagement or other cause, has yielded no earnings which may be capitalized into a franchise tax assessment. Indeed the record discloses a corporation which, as a part of a system, has made efforts to reduce its operating expenses and produce maximum earnings for each of its component parts. No proof was offered upon a stock or bond theory, nor does that theory appear to be applicable in view of the peculiar relations of relator. The controversy between the parties arises rather over differing theories as to how net earnings shall actually be ascertained. The relator, though its stock is controlled by the Brooklyn Rapid Transit Company, is a separate and independent corporation. It keeps an accurate record of the earnings of each of the lines in question. It shows by uncontradicted proof that three of its lines operated exclusively in the borough of Queens. These lines in 1904 produced gross income from passenger traffic of $169,961.57. The other three lines, which operated in Queens and Brooklyn boroughs, together produced $407,255.25 gross earnings. The greater percentage of track mileage of these three lines was in Queens $56^9/_{10}$ track miles, while $43^1/_{10}$ track miles were in Brooklyn. The great density of population was in Brooklyn. The source of passenger attraction was Brooklyn and Manhattan, where was located the business center to which people would naturally go and from which return. Cars were operated from a terminus in Brook-

lyn to a terminus in Queens and then returned to the starting point. The three lines being run by a single corporation in both boroughs, no exact account was kept of the fares collected in Queens as against Brooklyn. So far as transfers were given on the lines of the relator it would appear that this in no way interfered with the profits of the Queens borough lines under the circumstances. Queens borough passengers carried into Brooklyn and receiving a transfer permitting them to ride on lines in Brooklyn, under the circumstances, neither increased nor reduced the earnings in either Brooklyn or Queens. On the return of such passengers they would get transfers to their homes, so that each line really got its own fare and honored the transfer of the other line. It appears that, so far as transfers of the Brooklyn Rapid Transit system were concerned, the giving of such transfers was not necessarily the rule. These being the conditions the relator fairly claimed that the $407,255.25 earned by the two groups of lines should be divided on the basis of track mileage between the two boroughs. This method may indeed give an advantage to Queens over Brooklyn. On that basis $231,728.24 was apportioned to Queens, making a grand total of $401,689.81. If this theory of division of actual earnings failed to give the proper proportion of earnings to Queens it would easily have been the subject of criticism by experts who could have shown its impropriety. No such testimony was given by the defendant. To these actual earnings there was necessarily added a small amount of net earnings for advertising, mail, and express business, $3,021.18. This account was not accurately kept by relator, but was its proportion of the like earnings for the whole system upon the basis of its own car mileage. The referee, however, refused to be bound by these actual earnings. He followed a theory which increased the gross earnings by almost $100,000. He followed that theory solely because of the method of keeping the relator's accounts, not as to earnings, but as to some of its operating expenses. Because some of these operating expenses were not actual, but were an apportionment to these lines of like expenses of the entire Brooklyn Rapid Transit system on a car mileage basis, he contends that the theory so employed shall be applied to earnings as well, even though it largely increased the amount which these lines and the relator have actually earned.

Now the proofs show that the relator was a corporation independent of the holding company. It had its own separate set of books, its own treasurer, its own pay roll of conductors and motormen, received and kept its separate account of income from passenger operation of its own lines. Indeed this was the case with every other one of the corporations of the Brooklyn Rapid Transit system. The lines which were operated in Queens borough were extended far beyond the densely populated metropolitan section. In order to promote economies, as well as for other reasons, an arrangement existed between the companies in the system as to other matters of expenditure. Power houses were operated by one corporation, which furnished power to the other companies, including the relator, at cost. One set of general officers existed, all of whose salaries were apportioned among all of the corporations in the system in proportion to the number of car

miles operated by its railroad. One set of repair shops was maintained, which repaired the cars of all and charged each corporation its proportion of such expenses on a car mileage basis. These expenditures, which ordinarily would have been exact expenditures in the case of another corporation, were, therefore, apportioned to relator on this car mileage basis; and the amount apportioned was the amount which appeared on its books. The relator, as a matter of fact, could give no other proof than it did give on these few items of expenditure. Its good faith is not attacked in making this apportionment. The relator's witnesses testified that this method actually resulted in economies. This fact was not disputed by any testimony. No claim is made that these lines are mismanaged. The proof shows that the relator, despite the combination, gets credit for its own earnings and carries these only on its books. The combination results in an actual increase over earnings which might be expected if the roads in question were operated independently of the system. The method employed as to certain expenditures, the car mileage method, the witnesses say results in an actual saving—in actual economies over operation carried on independently. There is no denial of these statements as facts, and the net earnings which result must contain, therefore, all the value of the combination.

The real question which was then presented to the defendant was not one of theory but of fact. Were those expenditures in excess of a reasonable amount which should be expended by a like corporation doing a like business? Every fact necessary to found an adverse opinion on this question was presented by the relator in its proof—actual number of cars, car mileage, track mileage, actual tracks and overhead structures, and actual earnings. In these days of engineering and accounting, if these expenditures were excessive—if the theory employed were improper—it would have been entirely competent for the defendant to have produced witnesses who could have shown a reasonable amount to be expended under like conditions for the like purposes. The relator gave the best proof on this subject that it was capable of producing. In the absence of contrary proof, which was capable of being given, it cannot be assumed that the theory was improper, or the amount of the expenditures excessive. It may well be assumed that the State Board, in assessing the Brooklyn franchises of relator, took their actual earnings into account. To now spread those earnings back over the Queens borough section would to some extent result in double taxation. It does not appear what record was before Judge Fitts in a former litigation. Col. Williams' letter in 1902, referring to a whole interlacing system and not six lines whose earnings were actually kept, cannot require in 1905 the adoption of the referee's car mileage theory.

Actual earnings are shown. The expenditures asked to be allowed are confessedly not in excess of those which reasonably should be made for these lines, operated as they were in 1904. Deducting from the total earnings (including advertising and express earnings) the operating expenses $284,347.85 so proven, leaves a net return over operation of $120,363.14. The relator claimed that this amount of earnings over operation was actually absorbed, after making certain deductions

which it claimed were proper. These amounts which it claimed the right to set out of net earnings included taxes on actual passenger earnings shown, a small amount of bridge tolls, and an item of 10 per cent. to cover 6 per cent. return, and depreciation, obsolescence and perhaps taxes, figured on actual equipment of 111 cars used, the power plant and transmission facilities necessary to operate these cars, the value of the depots and shops necessary to house and repair such cars, and a like percentage upon the cost of tracks and overhead work employed in connection with the franchises. An exact statement of these items is as follows:

| | |
|---|---:|
| Annual state tax, one per cent. on actual earnings | $ 4,016 89 |
| Bridge tolls | 203 17 |
| Ten per cent. on present value of 111 cars in actual use | 44,400 00 |
| Ten per cent. on value of power plant and transmission facilities necessary to operate 111 cars | 44,400 00 |
| Ten per cent. value of depots and shops necessary to house and repair 111 cars | 11,100 00 |
| Ten per cent. on actual cost of tracks and overhead work | 62,688 81 |
| | $166,808 87 |

The referee, instead of proceeding upon these figures, proportioned like deductions from the expenditures of the whole system on a car milage basis and allowed the following:

| | |
|---|---:|
| Six per cent. return on car mileage theory of value of equipment, depot and shop facilities | $ 50,049 92 |
| Six per cent. return on present value tracking and overhead in streets | 25,090 35 |
| Two per cent. depreciation on car mileage theory of value of all tangible property, based on the whole system | 16,249 23 |
| Two per cent. depreciation on actual engineers' cost of tracks and overhead in streets | 12,537 76 |
| One per cent. state annual tax on earnings (to this extent adopting the actual earnings $401,689.80) | 4,016 89 |
| Taxes, including special franchises on car mileage theory of whole system | 20,948 50 |
| Total | $128,892 65 |

To follow this theory where actual values are shown is, regardless of the percentage taken, to spread allowances for the whole system over Queens, when an actual allowance, or an amount which it should not exceed, is capable of ascertainment. An actual equipment, 111 cars, existed, which produced actual earnings. The power plant and transmission facilities necessary to operate these, and depots and shops necessary to house and repair them, were capable of being, and were, estimated. No claim is made that as an estimate this was erroneous. It would seem, therefore, that the relator's theory of deductions, regardless of amounts, should be followed.

Two important deductions which the referee made may be here considered, as both of them affect this claim on the relator's theory. Relator claimed 6 per cent. return on actual cost of tracking and overhead work. It was not entitled to more than this return on the present value. That present value was by the referee fixed at $418,172.51, so that there was properly to be deducted from relator's claimed al-

lowances 6 per cent. on the difference between that sum and the cost, $626,888.18, which would amount to $12,522.94. This deduction does not quite agree with that made by the referee, because the referee evidently has not figured the 6 per cent. upon what he found to be the actual value of this property, but rather upon some basis which did not include engineering. The second deduction made by the referee was the allowance of but 8 per cent. instead of 10 per cent. as covering return and depreciation of all tangible property employed. From the briefs submitted it appears that this was done upon a theory that, taxes being allowed in full, relator was entitled to 6 per cent. return, 2 per cent. depreciation, and no deduction whatever for obsolescence and inadequacy.

It is claimed by the city that the theory of a charge off for obsolescense, as distinguished from depreciation from ordinary wear, is not supported by authority in the state of New York or elsewhere. Several federal cases are cited by the city as sustaining this proposition, but reliance is chiefly placed on the opinion of the referee in the Third Avenue Case. The federal cases lay down no such definite doctrine. They are to be construed in the light of the facts involved and the relief desired. On the proposition that a public service corporation may fairly be allowed to make such deductions from its annual earnings as will prevent the need of issuance of additional securities to replace depreciated capital, more pertinent doctrine may be found in Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371. But in the Third Avenue Railroad Company Case Judge Hall is stated to have said:

"There is no suitable way by which a sum of money could be deducted from earnings and set apart yearly to provide against change of type of road, machinery or cars; there is no way of saying when, if ever, such a change might occur or its cost."

He was evidently moved to this statement by some claim made as to great outlay incident to the change in a short period of time from horse cars to cable cars, and from cable cars to electricity. The theory does not appear to be discussed by the Appellate Division in People ex rel. Third Avenue Railroad Company v. State Board of Tax Commissioners, 136 App. Div. 159, 120 N. Y. Supp. 528. There, on the general question of depreciation, the court says:

"Much of the relator's property was comparatively new; some of it was practically indestructible. It is but fair that the years in which there is little or no call for the replacement of property used should contribute to a fund so that the year in which the property fails shall not be charged with its entire replacement."

This was substantially the holding in the Jamaica Water Supply Company Case both in the Appellate Division and in the Court of Appeals. People ex rel. Jamaica Water Supply Company v. State Board of Tax Commissioners, 128 App. Div. 17, 18, 112 N. Y. Supp. 392; 196 N. Y. 57, 89 N. E. 581. If Judge Hall's decision is to be construed as laying down the rule that no allowance shall be made for any obsolescence or inadequacy not yet sustained, but capable of reasonable ascertainment for the future, it does not appear to me to be

consistent with the expressed policy of this state. As surely as humanity travels to the grave, the machinery and equipment of a public service corporation travel toward the scrap pile. The plant and structures depreciate in less degree but as certainly. This is ordinary depreciation. But another form of depreciation in the case of properties here being valued takes place. The machinery or equipment, while still capable of years of service, becomes inadequate to do the work demanded—not only by the corporation, but by the law itself. In the case particularly of electrical machinery, the type becomes obsolete by reason of invention, and increasing public demands frequently require in aid of safe and adequate service that the obsolete appliance or equipment give way to the new. Property which in itself may be almost indestructible in the hands of a public service corporation may be required to be replaced by the requirements of the public which the corporation serves. These requirements for change of plant, structure, and equipment and their replacement, can be and are made by the state itself. Some of these changes are capable of definite ascertainment. Others are not so readily ascertainable. Many of them, however, may be provided against for the future by setting apart from gross earnings a reasonable sum to create a reserve against the day when they shall come. This reserve, with amounts set apart for ordinary depreciation, go to amortize the capital of the company. Amortization of capital is something of a novelty in the case of these corporations. It is not, however, a novelty in other forms of business activity. Amortization of securities of trustees and moneyed corporations has been known for many years. In recent years this principle has been by statute applied to amortization of the securities in which the capital of banking corporations is invested. For many years the principle has been applied by manufacturing corporations. It is a well-known fact that some of the largest manufacturing corporations charge off a large percentage of their annual earnings to a depreciation fund, which includes both obsolescence and inadequacy. Public service corporations alone were slow to recognize this necessity. The wrecks of many such corporations scattered throughout the state of New York would not to-day be seen if early this principle had been applied to their accountings. The fact that any future depreciation account was a novelty in the accountings of these corporations is probably the reason why little has been said by the courts in franchise tax cases on this subject. In the old days, after original paid-in capital and original bond issues had regularly paid their dividends and interest out of earnings, and the plant had depreciated or become in whole or in part inadequate or obsolete, it was customary to issue a new batch of bonds to cover a new plant, while the old plant was actually on the books at practically its original value. Capital remained apparently unimpaired and clamoring for dividends. If the money were finally obtained, the complaisant bondholders sooner or later owned the road, and upon reorganization were obliged in the interest of the property to eliminate in whole or in part the original stockholders.

The necessity for safe and adequate service, reasonable rates, and of state control of the issuance of securities led a great executive to

formulate the Public Service Commission Law of 1907 (Laws 1907, c. 429). The Commission, which under that law has now jurisdiction of the relator, was, by section 52 of that statute, authorized to establish for relator a uniform system of accounts of its receipts and expenditures. That section in part provided:

"The Commission shall at all times have access to all accounts, records, and memorandum kept by railroad and street railroad corporations, and may prescribe the accounts in which particular outlays and receipts shall be entered."

This court may take judicial notice that pursuant to that authority the First District Commission has prescribed such a uniform system. By that system each month, as to equipment and ways and structures, this relator is required to charge out of its earnings an amount to cover not only wear and tear, but obsolescence and inadequacy estimated to have accrued; and a new account, "accrued amortization of capital," is required to be maintained. That amount accrued is to be ascertained on a rule determined by the corporation "derived from a consideration of the said corporation's history and experience during the preceding five years." It is to be based upon a sworn statement of facts and expert opinions. A like rule is adopted by the Second District Commission.

The decision in People ex rel. Delaware & Hudson Company v. Stevens, 197 N. Y. 1, 90 N. E. 60, relative to the powers of the Commission as to the issuance of securities, was followed after the adoption of these systems of accounts by amendments to this law passed in 1910 (Consol. Laws 1910, c. 48). Section 55 of that statute as amended requires that the Commission's order allowing the issuance of securities must state that, "in the opinion of the Commission, the money, property, or labor to be performed or paid for by the issuance of such stock, bonds, notes or other evidence of indebtedness is or has been reasonably required for the purposes specified in the order, and that except as otherwise permitted in the order in the case of bonds, notes, and other evidences of indebtedness, such purposes are not in whole or in part reasonably chargeable to operating expenses or to income." This would appear to be a legislative recognition of the systems adopted providing for the charge, out of income, of items for obsolescence and inadequacy, upon a plan which apparently according to the state was reasonably capable of ascertainment from the experience of the corporation itself. The policy of the state today, so reflected by statute, is in favor of these charges out of earnings. How can it be said then that, at the time of the making of this assessment, or at the trial in 1907, such a theory was improper, or that the obsolescence and inadequacy were incapable of ascertainment? If they may be ascertained now, they were equally then ascertainable. The law has seen fit to impose a tax upon the special franchises granted under its authority. The ascertainment of that tax has been in some cases made dependent upon what is known as the net earnings rule. No other rule than that of earnings has been suggested by any party as being applicable to this case. To the advantage which a public service corporation enjoys by reason of its monopoly, the law adds a dis-

advantage which will permit supervision of the rates charged by the corporation. Excessive profits may not be divided among dividends at the expense of the public. The corporations must provide under the present statute safe and adequate service. Upon this the statute is insistent, and the highest power has been conferred upon the Commission to see that this provision of the law is complied with. To provide safe and adequate service is not to maintain old and obsolete cars, even though by constant repair they may be kept from dissolution. It is to keep in touch with the times, and to displace obsolete or inadequate appliances or structures with new and approved appliances. These expenditures come suddenly in some cases—in others their approach may be apprehended.

Here is a commission, having supervision of the operations and accounts of relator, which has the right to insist upon the establishment of a fund to cover some obsolescence as well as ordinary depreciation. The defendant's theory makes another commission equally insistent that no reasonable basis exists for the creation of such a fund. If it is the policy of the state of New York that the Tax Commission, as suggested by Judge Hall, shall not permit deductions from earnings to provide against future obsolescence or inadequacy, then we have one department of state hopelessly antagonistic to another department of state—one which may create value for the purpose of taxation out of funds which another may say should have been applied to the creation of a fund not subject to that form of taxation. This condition of affairs cannot be assumed to exist. If, then, a public service corporation upon this question comes into court and requests in good faith that it be permitted to set aside a reasonable amount of its gross earnings for such a purpose, it is difficult for me to understand why the court should refuse to consider that request. The good faith is shown in the fact that, in 1905 or 1906, this relator did write off from its gross earnings a half million dollars to a distinct fund for depreciation sustained and for which previous provision had not been made. Relator, in its 10 per cent. deduction, allowed 6 per cent. for return; according to Mr. Abel the remaining item of 4 per cent. was a gross item covering depreciation, obsolescence, inadequacy, and taxes.

The testimony on the question of taxes actually paid was not as clear as it might have been. The proof, however, gave the value of the real estate estimated to be employed for these lines and the rate of taxation thereon. There was also proof of taxation on a car mileage basis. Whatever the proof as to taxes paid, the testimony clearly shows that 4 per cent. was not too high a deduction for depreciation and obsolescence alone. The referee was evidently of this opinion, for he allows $20,948.50 as a special item for taxes, and then 2 per cent. in addition for return for depreciation. This was on the theory, worked out from Mr. Menden's evidence, that one-half of an allowance for depreciation and obsolescence might cover depreciation alone. On any theory, however, the addition of even real estate taxes, excluding franchise taxes, as to which there might be some question, would have largely increased the deduction requested over 10 per

cent.; and that deduction does not, therefore, appear an unreasonable amount to be allowed.

The theory of relator's additional deductions is sustained.

| | | |
|---|---|---|
| From the total of.............................................. | | $166,808 87 |
| The following deductions should be made: | | |
| Excess of return on difference between cost and present value of tracks, etc........................... | $12,522 94 | |
| Bridge tolls........................................ | 203 17 | |
| Four per cent. on $27,750, value of land for power house and depots deducted because no depreciation should be figured on land........................ | 1,110 00 | |
| | | 13,836 11 |
| Total ................................................ | | $152,972 76 |
| Deficit over net earnings, after deducting operating expenses.... | | 120,363 14 |
| | | $32,609 62 |

While this deficit results in a finding that the intangible property of the relator has no value for the purpose of franchise tax assessment, it does not mean that the franchises are absolutely valueless. It means that the relator's right to a just return upon its property and to provide against the future has been recognized. It means, further, that the public are in this way reasonably protected against unjustified increases of rates to meet interest on an overload of securities, while provision is reasonably made for safe and adequate service.

That the franchises are not valueless is apparent from the value which is placed upon the tangibles used in connection therewith. If the franchises were absolutely valueless, the tangibles in the streets would only have a junk value. People ex rel. Metropolitan Railway Company v. State Board of Tax Commissioners, 174 N. Y. 417, 67 N. E. 69.

The value of the relator's tangibles is fixed at the sum of $418,-172.51. This is the only property which is susceptible of assessment under the special franchise tax law.

Equalizing the assessment upon this property with the assessment made upon other real property in Queens borough, the relator's assessment for 1905 on its special franchises is fixed at the sum of $334,-538.01.

The report of the referee is vacated and set aside.

Findings and a final order may be submitted in accordance with this opinion.

Relator may have costs and disbursements as provided in section 294 of the tax law (Consol. Laws, c. 60).

Ordered accordingly.