BALABAN & KATZ CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

TIVOLI THEATRE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5386, 7452.    Promulgated March 26, 1927.

The deduction for exhaustion, wear and tear, and obsolescence of modern moving picture theatres in Chicago determined to be a rate of 3 per cent.

*Edward Sonnenschein, Esq.,* for the petitioners.
*J. W. Fisher, Esq.,* and *L. C. Mitchell, Esq.,* for the respondent.

These proceedings involve deficiencies of $10,894.28 for the calendar year 1922 in the case of Balaban & Katz Corporation, and and $20,192.85 for the calendar years 1921 and 1922 in the case of Tivoli Theatre Co., both arising from the action of the Commissioner in disallowing in part deductions for depreciation and obsolescence of theatre buildings.

### FINDINGS OF FACT.

The petitioner, Tivoli Theatre Co., is an Illinois corporation, with its principal office in Chicago. It operates the Tivoli Theatre at 63rd Street and Cottage Grove Avenue, Chicago. This theatre has a seating capacity of 3,700 persons and is in the center of a theatre-going population equivalent to a city of 750,000 persons.

The business of these theatres is dependent to a very large extent on recurring trade, that is, the trade which returns week after week to see the pictures shown at these theatres. This trade is attracted by the comfort, convenience, service, and facilities offered, and by the location of the theatres.

Both the Tivoli and the Chicago theatres are moving picture theatres. Their construction was begun in 1920 and completed in 1921. At the time they were built they were the largest theatres in Chicago and had incorporated in them all the improvements known to be desirable in the construction of moving picture theatres. Since that time, however, there have been developments which make the features of these theatres less desirable than those of new theatres being constructed which incorporate the improvements known at the present time.

The trend since their completion has been toward theatres of somewhat larger seating capacities. The hold-out space or standing room space outside the theatre proper has been increased; the stage area has been increased; stage lifts, overhead ventilation and air washing and refrigeration equipment are regular equipment;. the sight lines are improved and the operating booth is located on a level with the screen to eliminate distortion. In the Chicago and Tivoli theatres the construction is such that the operating booth must be kept at the highest point in the theatre and can not be placed level with the screen. Ventilation is accomplished by means of a system underneath the seats and can not be changed to the overhead system, which is more satisfactory. The Tivoli has been equipped with a stage lift since its construction, but the Chicago has not been and can not be on account of the nature of the construction of the building. The mechanical equipment for the theatres is located beneath the auditorium rather than in a separate building as in theatres constructed in accordance with advanced ideas. Both these theatres have loose box chairs rather than stationary chairs. This feature is undesirable.

The stage area in these theatres is small, and they can not be adapted to the presentation of " legitimate shows."

At the present time there is in process of development what is known as third dimension motion pictures, which give the effect of having depth rather than being simply a flat surface. For showing such pictures a larger screen is needed and the operating booth must be on a level with the screen. The presence of mezzanine and balcony floors in these theatres prevents the changing of the booths, and such pictures could not be shown.

Other factors which may have an effect on the future conduct of motion picture theatres are the broadcasting of motion pictures by radio, orchestration by means of radio, the showing of color pictures and speaking motion pictures.

In 1908 the moving picture houses in Chicago were constructed without a stage and seated from 100 to 200 people. Later 300-seat houses were built. From 1912 on for a period of several years houses with a seating capacity from 600 to 1,000 were built. From 1914 to 1917 theatres with a capacity from 1,400 to 1,700 were being built. All of these were without stages. In 1917 a theatre having a seating capacity of 2,000 and having a stage was built in Chicago, which was the largest motion picture theatre known at that time.

New theatres are being planned in the location of the Tivoli Theatre which have greater seating capacities, and other large theatres are being erected in the vicinity of both the Chicago and Tivoli theatres.

The value of the land on which the Chicago Theatre is situated is constantly increasing.

The Chicago Theatre is not showing to capacity houses.

The expectant useful economic life of each of these theatres at the time of their completion was thirty-three and one-third years, and a reasonable allowance for exhaustion, wear and tear, including a reasonable allowance for obsolescence, is 3 per cent annually.

### OPINION.

STERNHAGEN: The determination of a reasonable allowance for obsolescence to be included within the depreciation deduction necessarily involves an attempt to prophesy the future. This precludes any certainty, and the degree of soundness or accuracy with which the prophecy can be made depends upon whether the property and the business in which it is used has had sufficient past experience to form the basis of an estimate for the future. In the present case the problem is applied to two modern theatre buildings for the display of moving pictures. They were constructed in 1921 and are still generally regarded as up to date and attractive to the public as modern places of amusement. The petitioners, however, have introduced evidence substantial both in quantity and quality for the purpose of showing that, by reason of rapid and material changes in the construction of such theatres brought about by new mechanical devices and new demands of the public for comforts and conveniences, a look into the future can be made with reasonable assurance that these theatre buildings will be obsolete in twenty-five years at the latest. The respondent has measured the period of forty years. The evidence leaves no doubt that the period of physical exhaustion and wear and tear is substantially longer than either of these periods, and therefore the sole question involved is the period at obsolescence.

The difficulty in this problem is to steer a safe course between a period which sensible people would regard as unreasonably long, on the one hand, and on the other a period which represents a pessimistic guess. In the present instance it may fairly be said that the period estimated by each party can find some support in the evidence. The burden is upon the petitioners, and we are of opinion from the evidence that the period of twenty-five years for which they contend is shorter than is justified. After careful consideration we have concluded that a fair estimate of the probable life of these buildings before they become obsolete is thirty-three and one-third years from their construction, and that 3 per cent is an ample allowance annually to achieve the complete recovery of their capital cost.

*Judgment will be entered on 20 days' notice, under Rule 50.*