Fidelity Union Trust Company as executor and trustee, Paul R. Scheerer, Joseph D. Scheerer and Lois S. McGraw, individually and as executors and trustees under the will of William Scheerer, deceased, seek construction and instruction with relation to portions of the will concerning which they are in doubt. *Page 416 
The decedent was survived by his widow Lois Durand Scheerer, and his three children: Paul R. Scheerer, Joseph D. Scheerer and Lois S. McGraw. Paul R. Scheerer has three children: Lynda F. Scheerer, Mary L.D. Scheerer and Paul R. Scheerer, Jr. Joseph D. Scheerer has two children: William Scheerer, II, and Joseph D. Scheerer, Jr. Lois S. McGraw has one child, James H. McGraw, III. All are parties to the proceeding and represented by counsel.
Under paragraph "Fourth" of his will the testator sets up separate but identical trusts for the benefit of each of his three children and directs that upon the death of the survivor of the children the principal and all unexpended income of the three trust funds are to be considered as one fund and divided percapita among his grandchildren.
Each trust provides for certain payments out of principal to his widow, Lois Durand Scheerer, upon her requests for such payments; and, further, during the lifetime of the widow, for such income or principal payments to the widow or the named child as the corporate trustee may consider necessary or advisable. The life beneficiary of each trust, it is to be noted, is not given the net income from the separate trust fund outright. After the death of the testator's widow, the trustees are authorized to pay to each child, upon request, the sum of $15,000 annually out of principal, and so much of the income or of the remaining principal for the use, enjoyment or benefit of the respectively named life beneficiary or his or her spouse or children as the corporate trustee shall consider necessary or advisable. In the event of the death of the respective life beneficiary before the death of the widow or upon the death of the respective life beneficiary, the income from the separate trust fund is directed to be paid to or expended for the benefit of the issue of the respective life beneficiary until the death of the last survivor of the testator's children.
The decedent was the owner of a number of stocks and other securities and of several parcels of real estate. Practically all of the stocks and other securities have been retained by the executors as assets of the estate. The real estate has been sold with the exception of 118-122 Market Street, *Page 417 
Newark, which has been transferred to the trustees and is now held by them as an asset of the trusts.
This property has a frontage of 44 feet on Market Street and extends in "L" shaped fashion to Halsey Street where it has a frontage of 90.57 feet. Erected thereon is a theater building of concrete, steel and brick construction, and also one store on Market Street and two stores on Halsey Street. The building was erected in 1915. These premises were leased by the decedent in 1925 to the 120 Market Street Corporation for a period beginning January 1st, 1926, and ending May 1st, 1950, at the following net rentals: January 1st, 1926, to February 1st, 1929, $40,000; February 1st, 1929, to May 1st, 1936, $45,000; May 1st, 1936, to May 1st, 1950, $60,000. The lease at divers times was modified and substantial reductions in rental granted.
The lease was assigned to the present tenant, the Stanley Fabian Corporation, in 1930; and by agreement dated July 3d 1931, the net annual rental under said lease was guaranteed by Warner Brothers Pictures, Inc., and again guaranteed by agreement with said Warner Brothers Pictures, Inc., dated February 18th, 1944. February 18th, 1944, the lease was extended for an additional term of five years commencing May 1st, 1950, and ending April 30th, 1955. Presently the net annual rental is $50,000.
Since the date of the death of the testator, no part of the income of the estate or of the principal and income of the trusts has been paid by the executors and trustees. No requests for such payments have been made. The net yearly income in the executors' account amounts to approximately $28,500, and the present yearly net income from the Market Street property amounts to $30,500. Accumulations of income amount to $48,856.43 in the executors' account and $18,986.81 in each of the three trust accounts.
Paragraph "Fifth" of the will provides:
"Fifth: In order to avoid forced liquidation, my Executors and Trustees in setting up the trust funds provided for by my will may, in lieu of cash, make use of stocks, bonds, securities or other real or personal property of which I may die possessed, such stocks, bonds, securities or other real or personal property to be taken for this purpose *Page 418 
at their reasonable value, in the judgment of my trustees, as of the time such trust funds are set up. The trustees may continue to hold, in their discretion, any stocks, bonds, securities or other real or personal property which I may possess at the time of my decease. The trustees may invest and reinvest the said trust funds in such stocks, bonds, securities or other real and personal property as the trustees in their discretion shall deem suitable for the best interest of said trusts, notwithstanding that the same may not be such as are classified now or hereafter as legal investments for trust funds under the statute or case law of the State of New Jersey. The trustees may in their discretion borrow upon the security of the trust funds, and pledge the same in that connection for any purpose deemed by them to be in the interest of the trusts. The trustees need not make any provision for amortization of premiums paid on any securities, and need not apportion any income which may be received by them to principal, except in their discretion."
Paragraph "Fourteenth" of the will reads:
"With respect to any real estate which the Trustees may hold as part of the principal of any of the trusts, my Trustees shall be empowered to make such provision for deterioration and obsolescence with respect thereto as in their judgment may be wise."
 I.
May complainants out of the net annual income from the Market Street property now held in the trusts create a sinking fund to recover deterioration and obsolescence of the property and so preserve intact the physical and economic integrity of the trustcorpus? In addition to seeking judicial sanction of the creation of such a fund, complainants further seek the court's approval in respect of the mechanics of allocating or apportioning income to such a fund whereby the annual sum allocated to the fund for deterioration is to be determined by complainants in the exercise of a reasonable judgment and whereby the annual sum allocated to the fund for obsolescence is to be determined on the basis of some portion of the net annual rental received from the property.
In order to determine what was the intention of the testator, a discussion of the use of the words "deterioration and obsolescence" is required as well as their peculiar applicability to the property held in the trusts, and the propriety of creating a sinking fund under the will. *Page 419 
The terms "deterioration" and "obsolescence" are not interchangeable but refer to separate and distinct means whereby a capital asset suffers a diminution in value.
Deterioration is defined as "Impairment, as in quality, character, or value, due to use, wear and tear or other physical causes." Webster, New International Dictionary (2d ed.unab.).
Depreciation, which for the past fifty years has been given extended and increasing consideration by accountants, engineers and appraisers, is recognized legally as an important element in the determination of value, net earnings and income, Cf.Whittaker v. Amwell National Bank, 52 N.J. Eq. 400, and has as its function the establishment of a fund sufficient in the aggregate to restore a capital asset at the end of its estimated physical life. It is recognized as an element present in the administration of trusts with successive beneficiaries. See 2Scott on Trusts, § 239.4; In re Mathew's Estate (S.Ct., Wisc.,1932), 210 Wisc. 109; 245 N.W. Rep. 122.
On the other hand, obsolescence refers to an element that is separate from the physical decline in value and is utilized to describe the fact that the useful life of an asset is often terminated or its value decreased by reason other than physical deterioration. It refers to a functional capital loss or a diminution of economic usefulness and "may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value." United StatesCartridge Co. v. United States (1932), 284 U.S. 511;76 L.Ed. 431. "Obsolescence is quite different from depreciation or wear and tear. It is the process of falling into disuse, and relates primarily to commerial usefulness and public acceptance, rather than to what one of the witnesses in this case termed `technical utility.'" Hazeltine Corp. v. Commissioner
(C.C.A. 3d 1937), 89 Fed. Rep. 2d 513. See, also,Burnet v. Niagara Falls Brewing Co., 282 U.S. 648;75 L.Ed. 594; People v. State Board, c. (S.Ct., N.Y., 1910),69 Misc. 646; 127 N.Y. *Page 420 Supp. 825; United States v. Wagner Electric Manufacturing Co.
(C.C.A., 8th, 1942), 61 Fed. Rep. 2d 204;Townsend-Ueberrhein Clothing Co. v. Crooks (D. Ct., Mo.,1930), 41 Fed. Rep. 2d 66; Conley Tin Foil Corp. v.Commissioner, 17 B.T.A. 65.
There can be no question concerning the applicability of deterioration or physical depreciation to the property held in trust. Nor can there be any doubt that the property held in trust is subject to the element of obsolescence. In 4 Merten, Law ofFederal Income Taxation (1924), § 23.114, the subject of obsolescence and theater properties is discussed as follows:
"Theaters present a striking illustration of the operation of the factor of obsolescence. Catering to the amusement side of the public's activities, the theater business is necessarily subject to fluctuations. Beginning in about 1917, there was a decided change in the type of theater designed. The seating capacity was very materially enlarged; second balconies were for the most part eliminated, bringing patrons more or less into the same price class. The cantilever arch was used in balcony and roof construction, thereby eliminating posts in the auditorium. The advent of pictures required substantial changes in the layout so as to improve sight lines. The different type of entertainment which came in required changes and refinements in the acoustics; theater interiors became more elaborate and artistic, with the theater, as well as the performers, catering to the public's entertainment. Substantially improved facilities were included in the way of smoking rooms, lavatories, playrooms for children, c.
"For a time the increasing factor for obsolescence was not so noticeable because of the unusual demand for theaters brought about by the competitive demand for theaters in which to exhibit the products of the motion picture industry. Comparisons, however, of earning capacity of the new theaters, by which are meant those constructed for the most part after 1920, and the older theaters show a very high rate of obsolescence in the case of the latter."
The innovation of sound pictures which required a complete change in existing facilities is a striking example of a factor resulting in special obsolescence. A recognition of this susceptibility to obsolescence has caused the taxing authorities, for example, to allow an income tax deduction to theater property owners for obsolescence of their properties. See Graeper v.Commissioner (1933), 27 B.T.A. 632, wherein it is said: *Page 421 
"The building is of re-enforced concrete construction and should last for many years. But its usefulness as a theater will be much less than its physical life. Already the character of its patronage has deteriorated and several newer theaters have become its competitors. One witness, a real estate appraiser of experience, limits the useful life of the theater in question to twenty years from its date of construction. He also testified that any remodeling for stores or offices would be impractical.
"The respondent's allowance of three per cent. deductions was apparently for depreciation only. We think there should be some allowance in respect of obsolescence. * * *"
See, also, Balaban and Katz Corp. v. Commissioner (1927),6 B.T.A. 610; affirmed (C.C.A., 7th, 1929), 30 Fed. Rep.
2d 807.
The creation of a sinking fund to provide against deterioration and obsolescence of the property held in trust in the manner here urged by complainants is consistent with the authorization granted complainants by paragraph "Fourteenth" of the will, when read in connection with that portion of paragraph "Fifth" of the will which authorizes the complainants to retain as an asset of the trusts any real property held by decedent at the time of his death, and when considered in the light of the history of the decedent's transactions in respect of the lease of the property in question, it becomes apparent that the testator intended to authorize complainants to do that for which they now seek judicial approval. The propriety of creating such a fund is recognized by the authorities. See 2 Scott on Trusts, § 239.4;Re Rose (1940), 1 D.L.R. 139. This is particularly true where a business is conducted on the premises held in trust. Cf.Matter of Jones (1886), 103 N.Y. 621; 9 N.E. Rep. 493. In 2Scott on Trusts 1345 § 239.4, it is stated:
"* * * If the building is to be rented and it is probable that during the period of the trust it will become to a substantial extent less valuable through depreciation or obsolescence, it would seem that the trustee should have a power and may possibly be under a duty to set aside a reserve. * * *" *Page 422 
 II.
Complainants seek the advice of the court with respect to investment of the income accumulating in the estate and the trusts.
As a part of the exercise of the duty of complainants to use skill and care to make the trust property productive,Restatement, Trusts, § 181, the complainants are authorized to invest the accumulated income. Cf. Ashhurst v. Potter (Courtof Errors and Appeals, 1878), 29 N.J. Eq. 625; Holcomb v.Executors of Holcomb (Court of Chancery, 1857), 11 N.J. Eq. 281.
It is the duty of trustees as a general rule not to suffer money of others to remain idle. Hetfield v. Debaud, 54 N.J. Eq. 371; Fluck v. Lake, 54 N.J. Eq. 638; Frey v. Adm'rs ofFrey, 17 N.J. Eq. 71; Holcomb v. Executors of Holcomb, supra.
Under paragraph "Fifth" of the will "* * * The trustees may invest and reinvest the said trust funds in such stocks, bonds, securities or other real and personal property as the trustees in their discretion shall deem suitable for the best interest of said trusts, notwithstanding that the same may not be such as are classified now or hereafter as legal investments for trust funds under the statute or case law of the State of New Jersey. * * *" (Italics mine.)
The term "trust funds" is broad enough to include the income accumulated. Complainants may invest that accumulated income by reason of the express provision in the will in non-legal investments.
 III.
Complainants seek instruction of the court concerning their right to borrow cash from the income accounts to pay obligations when and if they arise, which obligations normally would be chargeable to principal.
Under the fifth paragraph "* * * The trustees may in their discretion borrow upon the security of the trust funds, *Page 423 
and pledge the same in that connection for any purpose deemed by them to be in the interest of the trusts. * * *"
Borrowing from income to discharge principal obligations is certainly in the best interests of the trusts. To deny the power will force a liquidation of capital assets which complainants, presently and pursuant to the authorization contained in the will, have determined to retain in the trusts.
 IV.
The fourth matter raised by the bill of complaint concerns the use of the word "or" in providing for certain payments to designated beneficiaries.
Subsections (a)2 and (a)4 of article "Fourth" are as follows:
"2. In addition to the provisions made in the foregoing subparagraph (1) and during the lifetime of my said wife, to pay to or expend for the use, enjoyment and benefit of my said wife,or of my said daughter, Lois S. McGraw, or either of them, so much of the income of the said fund, or of the remaining principal, from time to time as my corporate Trustee hereinafter named shall in its absolute judgment and discretion consider necessary or advisable for her or their care, comfort, relief or advantage, provided, however, that my said wife, if competent to do so, shall in each case approve such payment or expenditure."
"4. In addition to the provision made in the foregoing subparagraph (3), and during the lifetime of my said daughter, to pay to or expend for the use, enjoyment and benefit of my said daughter, or of the husband or children of my said daughter, or any one of them, so much of the income of the said fund, or of the remaining principal thereof, up to the whole amount of said principal from time to time as my corporate Trustee hereinafter named, shall in its absolute judgment and discretion consider necessary or advisable for her or their care, comfort, relief or advantage, provided, however, that my said daughter, if competent to do so, shall in each case approve such payment or expenditure."
Subsections (b)2 and (b)4 of article "Fourth" are as follows:
"2. In addition to the provisions made in the foregoing subparagraph (1) and during the lifetime of my said wife, to pay to or expend for the use, enjoyment and benefit of my said wife,or of my said son, *Page 424 
Paul R. Scheerer, or either of them, so much of the income of the said fund, or of the remaining principal from time to time as my corporate Trustee hereinafter named shall in its absolute judgment and discretion consider necessary or advisable for her or their care, comfort, relief or advantage, provided, however, that my said wife, if competent to do so, shall in each case approve such payment or expenditure."
"4. In addition to the provisions made in the foregoing subparagraph (3), and during the lifetime of my said son, to pay to or expend for the use, enjoyment and benefit of my said son,or of the wife or children of my said son, or any one of them, so much of the income of the said fund, or of the remaining principal thereof, up to the whole amount of said principal from time to time as my corporate Trustee hereinafter named, shall in its absolute judgment and discretion consider necessary or advisable for his or their care, comfort, relief or advantage, provided, however, that my said son, if competent to do so, shall in each case approve such payment or expenditure."
Subsections (c) 2 and (c) 4 of article "Fourth" are as follows:
"2. In addition to the provisions made in the foregoing subparagraph (1) and during the lifetime of my said wife, to pay to or expend for the use, enjoyment and benefit of my said wife,or of my said son, Joseph D. Scheerer, or either of them, so much of the income of the said fund, or of the remaining principal, from time to time as my corporate Trustee hereinafter named shall in its absolute judgment and discretion consider necessary or advisable for her or their care, comfort, relief or advantage, provided, however, that my said wife, if competent to do so, shall in each case approve such payment or expenditure."
"4. In addition to the provision made in the foregoing subparagraph (3), and during the lifetime of my said son, to pay to or expend for the use, enjoyment and benefit of my said son,or of the wife or children of my said son, or any one of them, so much of the income of the said fund, or of the remaining principal thereof, up to the whole amount of said principal from time to time as my corporate Trustee hereinafter named, shall in its absolute judgment and discretion consider necessary or advisable for his or their care, comfort, relief or advantage, provided, however, that my said son, if competent to do so, shall in each case approve such payment or expenditure." (Italics mine.)
It is obvious that the testator intended that the payments to be made under the three paragraphs "2" were to be made to or expended for the use, enjoyment and benefit of his wife and his son or daughter mentioned in the respective paragraphs, or either of them. And that with respect to the three *Page 425 
paragraphs "4," the testator intended that the payments to be made under said paragraphs were to be made to or expended for the use, enjoyment and benefit of his son or daughter mentioned in the respective paragraphs and his or her spouse and children, or any one of them. He did not intend alternative payments but intended to entitle each of the designated beneficiaries to share without regard to a payment to any of the other beneficiaries. He intended the word "or" to be used in a conjunctive sense and not in a disjunctive sense.